1  BARRACK, RODOS & BACINE
   STEPHEN R. BASSER (121590)
2  sbasser@barrack.com
   SAMUEL M. WARD (216562)
3  sward@barrack.com
   JOHN L. HAEUSSLER (215044)
4  jhaeussler@barrack.com
   402 West Broadway, Suite 850
5  San Diego, CA 92101
   Telephone:  (619) 230-0800
6  Facsimile:  (619) 230-1874

7  BARRACK, RODOS & BACINE
   LEONARD BARRACK
8  DANIEL BACINE
   3300 Two Commerce Square
9  2001 Market Street
   Philadelphia, PA 19103
10 Telephone:  (215) 963-0600
   Facsimile:  (215) 963-0838

11

12 Attorneys for Plaintiff, the Port Authority of Allegheny County Retirement and Disability
   Allowance Plan for Employees represented by Local 85 of the Amalgamated Transit Union

13

14              UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16 THE PORT AUTHORITY OF ALLEGHENY      ) Case No.:
   COUNTY RETIREMENT AND DISABILITY     )
   ALLOWANCE PLAN FOR EMPLOYEES         )
17 REPRESENTED BY LOCAL 85 OF THE       ) VERIFIED SHAREHOLDER
   AMALGAMATED TRANSIT UNION            ) DERIVATIVE COMPLAINT FOR:
18                                      )
            Plaintiff,                  ) 1. Breach of Fiduciary Duty
19                                      )
       vs.                             ) 2. Waste of Corporate Assets
20                                      )
   L. STEPHEN SMITH, W. ROGER HAUGHTON, ) 3. Abuse of Control
21 DAVID H. KATKOV, DONALD P LOFE, JR., )
   MARIANN BYERWALTER, DR. JAMES C.     ) 4. Gross Mismanagement
22 CASTLE, CARMINE GUERRO, WAYNE E.     )
   HEDIEN, LOUIS G. LOWER, II, RAYMOND L.)
23 OCAMPO JR., JOHN D. ROACH, DR.       ) JURY TRIAL DEMANDED
   KENNETH T. ROSEN, STEVEN L. SCHEID,  )
24 JOSE H. VILLARREAL, MARY LEE         )
   WIDENER, and RONALD H. ZECH,         )
25                                      )
            Defendants,                 )
26                                      )
       and                             )
27                                      )
   PMI Group, Inc.,                     )
28                                      )
            Nominal Defendant.          )

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.:

1.     Plaintiff the Port Authority of Allegheny County Retirement and Disability Allowance Plan for Employees represented by Local 85 of the Amalgamated Transit Union ("ATU85" or "Plaintiff"), by its undersigned attorneys, submits this verified derivative complaint ("Complaint") and alleges as follows:

## I.     INTRODUCTION AND NATURE OF THE ACTION

2.     Plaintiff brings this shareholders' derivative action on behalf of and for the benefit of PMI Group, Inc. ("PMI" or "Company") to redress ongoing injuries suffered by the corporation as a direct and proximate result of the defendants' violations of law and breaches of fiduciary duty as more fully alleged herein.  PMI is named as a nominal defendant in a derivative capacity.

3.     PMI provides mortgage and bond insurance and financial guaranty in the United States, Europe, Asia and Australia.  PMI was formed as a division of Allstate Insurance in 1972 and went public in 1995.  PMI operates internationally through several subsidiaries and maintains a 42% interest in the Financial Guaranty Insurance Corporation ("FGIC"), which insures bonds and asset-backed securities such as collateralized debt obligations ("CDOs"). PMI's management claims that their goal is to make PMI "the leading and the premier global provider of financial products that reduce risk, lower cost and expand market access for our customers."  However, as set forth herein, PMI's focus on mortgage insurance and its investment in FGIC, which engaged heavily in the insurance of CDOs, left the company dangerously exposed to fluctuations in the real estate and mortgage markets.

4.     In 2003 PMI purchased a 42% interest in FGIC which was established in 1983 as an insurer of municipal bonds.  Following PMI's purchase of a substantial interest in FGIC, FGIC implemented a "new business strategy focusing on growth" — a focus  that led FGIC away from a business that was based almost entirely on insuring municipal bonds to increasing reliance on a business model of insuring CDOs, including CDOs consisting of subprime residential mortgages and second-lien mortgages.

5.     As the real estate market exploded in the early 2000s, PMI's officers and directors increasingly relied on non-traditional business, which promised increased income for

1

the Company.  PMI insured mortgages with high loan-to-value ratios, mortgages issued to so-called "sub-prime" borrowers, and non-traditional mortgages such as adjustable rate mortgages and interest only mortgages, products carrying a greatly increased risk of default.  At the same time, FGIC increasingly engaged in the insurance of CDOs — securities that consisted of bundled mortgages — a dramatic departure from FGIC's core business of insuring bonds.  Between 2004 and 2006, partially fueled by the change in strategy at FGIC, PMI's net income from its financial guaranty business increased by more than 62%.

6.    The increasing reliance on non-traditional business greatly increased massive risk existing in PMI's core business of mortgage insurance and in its investment in FGIC.  The strategies followed by PMI and FGIC also left PMI doubly exposed to a downward turn in the real estate market as the Company could suffer losses from the default on loans that it insured, as well as the collapse of CDOs insured by FGIC, CDOs that consisted of increasingly devalued mortgages.

7.    Nevertheless, between November 2006 and March 2008, the Individual Defendants either caused to be issued or allowed to be issued materially false and misleading statements regarding PMI's business and financial results that not only downplayed, obscured or camouflaged these risks, but also highlighted their claims that they had adequately insulated the company from harm and capitalized on the opportunities generalized by PMI's business strategy.

8.    For example, PMI's 2006 Annual Report identified the company's "new tagline" – "Making Risk Rewarding" and highlighted PMI's efforts to expand its business by "supporting low down payment mortgages."  PMI's 2006 Annual Report focused on this "making risk rewarding" strategy, a "disciplined approach to credit risk management" and a "deep understanding of credit default behaviors" to downplay or obscure the fact that, as a result of the acts of the Individual Defendants, PMI was heavily exposed to an increasingly volatile mortgage market.

9.    Further, throughout late 2006 and 2007, the Officer Defendants repeatedly assured investors that PMI engaged in careful, selective and stable underwriting standards and

2

1   that the company maintained loss reserves adequate to protect it from a deteriorating real estate

2   market in which mortgage defaults were on the increase.

3       10.    These assurances inflated the value of PMI stock even as the company became

4   increasingly exposed to the risk of catastrophic losses.

5       11    But, in truth, during the same period, the defendants failed to adopt an internal

6   system of accounting controls necessary and sufficient to provide a reasonable assurance that

7   PMI's guidelines with respect to its portfolio of insured mortgages and related investments were

8   adequate to protect the Company and its assets, thus imperiling PMI.

9       12.    Despite ongoing and false public assurances by Defendants Smith, Katkov and

10   Lofe that PMI was adequately addressing the risk of volatility in the real estate and credit

11   markets, the Director Defendants repeatedly, consistently and systemically abdicated their

12   responsibility to undertake or demand that PMI implement and maintain an adequate internal

13   system of accounting controls necessary and sufficient to provide a reasonable assurance that its

14   guidelines with respect to its portfolio of insured mortgages and related investments were

15   adequate to protect the company and its assets.  By disregarding this lack of adequate internal

16   controls *for well over a year*, the Director Defendants – including those who held memberships

17   on the Board of Directors' Financial Guaranty Oversight Committee and/or Audit Committee

18   and/or Governance and Nominating Committee and/or Investment and Finance Committee —

19   violated or otherwise breached both their fiduciary duty of good faith and their fiduciary duty of

20   due care to PMI by failing to protect the company and its assets.

21       13.    In the late summer of 2007 and continuing in the months thereafter, the Officer

22   Defendants began a series of partial corrective disclosures, even as they reiterated their claims

23   that PMI maintained internal controls that limited its exposure to the declining real estate

24   market, when, in truth, they had not.

25       14.    Ultimately, albeit too late, it was announced on February 11, 2008, that PMI was

26   tightening its lending guidelines and that it would no longer issue loans with excessive loan-to-

27   value ratios.

28

15.    Then, after the close of the market on March 3, 2008, PMI was forced to disclose that it would not be able to timely file its annual 10-K report and that it would not invest any additional capital in FGIC. And on March 17, 2008, PMI reported its results for fiscal year 2007, disclosing a *loss in excess of $1 billion* in the fourth quarter of fiscal year 2007, largely due to losses at FGIC.

16.    The wrongful acts and breaches of fiduciary duty complained of herein have and will continue to subject PMI to continuing harm and losses and have exposed PMI to investor class action lawsuits with consequent costs, expenses and potentially massive damages.

## II.    JURISDICTION AND VENUE

17.    Pursuant to 28 U.S.C. 1332, this Court has jurisdiction over the subject matter of this action because the amount in controversy exceeds $75,000, exclusive of costs and interest, and the dispute is between citizens of different states.

18.    Venue is proper in this District pursuant to 28 U.S.C. 1391 because, among other reasons, PMI is located in this district and several defendants reside in this district.

19.    This Court has jurisdiction over each defendant named herein because each Defendant is either a corporation that does sufficient business in California, or an individual who has sufficient minimum contacts with California to render the exercise of jurisdiction by the California courts permissible under traditional fair play and substantial justice. Each of the defendants named herein are citizens of states other than that of the plaintiff.

20.    This is not a collusive action designed to confer jurisdiction that the court would otherwise lack on a court of the United States.

## III.    PARTIES

21.    Plaintiff ATU85 currently and during the relevant time has owned PMI securities and intends to retain shares in PMI throughout the course of this litigation. Plaintiff maintains its principal offices in Pittsburgh, Allegheny County, Pennsylvania.

22.    Nominal defendant PMI is incorporated under the laws of the state of Delaware and maintains its headquarters at 3003 Oak Road, Walnut Creek, CA  94597. According to its

1    filings with the SEC, PMI and its subsidiaries operate in the United States as well as the

2    remainder of North America, Europe, Australia and Asia.

3        23.    Defendant L. Stephen Smith ("Smith") is and was, at all relevant times, the Chief

4    Executive Officer ("CEO") of PMI. On May 17, 2007, Defendant Smith was elected chairman

5    of PMI by the Board of Directors. Defendant Smith is a member of the Board of Directors'

6    financial guaranty oversight committee.

7        24.    Defendant David H. Katkov ("Katkov") is and was, at all relevant times,

8    Executive Vice President of PMI and President and Chief Operating Officer of PMI subsidiary,

9    PMI Mortgage Insurance Company.

10       25.    Defendant Donald P. Lofe, Jr. ("Lofe") is and was, at all relevant times,

11   Executive Vice President and Chief Financial Officer of PMI.

12       26.    Defendants Smith, Katkov and Lofe are collectively referred to herein as the

13   "Officer Defendants."

14       27.    Defendant W. Roger Haughton ("Haughton") was, from April 1995 to June

15   2006, CEO of PMI and was, from April 1998 to May 2007, Chairman of the Board of Directors.

16   Defendant Haughton was a member of the Board of Directors' Financial Guaranty Oversight

17   Committee.

18       28.    Defendant Mariann Byerwalter ("Byerwalter") has been a director of PMI since

19   May 2001. Byerwalter is a member of the Board of Directors' Audit Committee.

20       29.    Defendant Dr. James C. Castle ("Castle") has been a director of PMI since

21   August 2002. Castle is a member of the Board of Directors' Audit Committee.

22       30.    Defendant Carmine Guerro ("Guerro") has been a director of PMI since August

23   2002. Guerro is a member of the Board of Directors' Audit Committee and Governance and

24   Nominating Committee.

25       31.    Defendant Wayne E. Hedien ("Hedien") has been a director of PMI since

26   January 1995. On May 11, 2007, Hedien exercised options and sold 4,500 shares of PMI

27   securities, realizing proceeds of approximately $139,000. Defendant Hedien is chair of the

28

5

1  Board of Directors' Governance and Nominating Committee and is a member of the Board of

2  Directors' Investment and Finance Committee.

3       32.    Defendant Louis G. Lower, II ("Lower") has been a director of PMI since May

4  2001.  Director Lower is a member of the Board of Directors' Compensation Committee, the

5  Governance and Nominating Committee and the Investment and Finance Committee.

6       33.    Defendant Raymond L. Ocampo, Jr. ("Ocampo") has been a director of PMI

7  since May 1999.  Director Ocampo is a member of the Board of Directors' Compensation

8  Committee and the Investment and Finance Committee.

9       34.    Defendant John D. Roach ("Roach") has been a director of PMI since May 1997.

10  Director Roach is a member of the Board of Directors' Audit Committee.  In February 2007,

11  Defendant Roach sold 10,000 shares of PMI stock for a total of approximately $503,000.

12       35.    Defendant Dr. Kenneth T. Rosen ("Rosen") has been a director of PMI since

13  January 1995.  Director Rosen is a member of the Board of Directors' Compensation

14  Committee, the Investment and was, during fiscal year 2006, a member of PMI's compensation

15  committee.  In May 2007, Defendant Rosen sold 24,000 shares of PMI stock for approximately

16  $1.2 million.

17       36.    Defendant Steven L. Scheid ("Scheid") has been a director of PMI since at least

18  May, 2004.  Director Scheid is a member of the Board of Directors' Compensation Committee

19  and the Governance and Nominating Committee.

20       37.    Defendant Jose H. Villarreal ("Villarreal") has been a director of PMI since May

21  2005.  During fiscal year 2006, Defendant Villarreal was a member of the Board of Directors'

22  Investment and Finance Committee.

23       38.    Defendant Mary Lee Widener ("Widener") has been a director of PMI since at

24  least May, 2004.  Widener also serves as a director of First American Bank Corporation, a

25  publicly traded corporation that, like PMI, operates in the surety and title insurance industry.

26  Director Widener is a member of the Board of Directors' Audit Committee and the Investment

27  and Finance Committee.

28

6

39.     Defendant Ronald H. Zech ("Zech") has been a director of PMI since May 1998. On May 18, 2007, Zech exercised and sold 9,000 shares of PMI, realizing proceeds of approximately $222,000. Director Zech is a member of the Board of Directors' Compensation Committee and the Governance and Nominating Committee. Defendant Zech is also a member of the Board of Directors' Financial Guaranty Oversight Committee and the Governance and Nominating Committee.

40.     Defendants Byerwalter, Castle, Guerro, Haughton, Hedien, Lower, Ocampo, Roach, Rosen, Scheid, Smith, Villarreal, Widener and Zech are collectively referred to herein as the "Director Defendants."

41.     Collectively, all of the Officer Defendants and Director Defendants are referred to herein as the "Individual Defendants." The Individual Defendants, through their positions as officers and/or directors of PMI and their receipt of reports, attendance at meetings, and access to all of the Company's books, records and other proprietary information, had responsibility for and therefore were in possession of material non-public information concerning PMI and its operations, finances and business prospects. This material, non-public information included, but was not limited to, the Company's financial condition, growth prospects, and the risks associated with PMI's exposure to the volatile mortgage insurance market.

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

42.     By reason of their positions as officers and/or directors of PMI and because of their ability to control the business and corporate affairs of the company, the Individual Defendants owed PMI and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage PMI in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interest of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of PMI owes to the company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the company and in the use and preservation of its property and assets, and the highest obligation of fair dealing.

7

43.    The Individual Defendants, because of their position of control and authority as directors and/or officers of PMI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

44.    To discharge their duties, the officers and directors of PMI were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the company.  By the virtue of such duties, the officers and directors of PMI were required to, among other things:

1)    exercise good faith and due care in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

2)    exercise good faith and due care in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

3)    exercise good faith and due care in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the company;

4)    exercise good faith in ensuring that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and

5)    refrain from unduly benefiting themselves and other PMI insiders at the expense of the company.

**Audit Committee**

45.    According to the charter of the Audit Committee of PMI's Board of Directors, members of the Audit Committee were charged with monitoring "the integrity of the financial statements of the company [and] the compliance by the company with management's policies

8

1  and procedures regarding legal and regulatory requirements[]."  In addition, the members of the
2  Audit Committee were responsible for reviewing "the adequacy of internal controls that could
3  significantly affect the Company's financial statements."  Between November 2006 and March
4  2008, the members of the Audit failed, on a sustained and systemic basis, to abide by these
5  responsibilities.

6  **Governance and Nominating Committee**

7      46.    Members of the Board of Directors' Governance and Nominating Committee
8  participated in and approved of PMI's corporate governance practices.  As stated in the charter
9  of the Governance and Nominating Committee, the committee is charged with assisting the
10 board "in promoting the best interests of the Corporation and its shareholders though the
11 implementation of sound corporate governance principles and practices."  The Governance and
12 Nominating Committee is responsible for "credit risk oversight and control, and shall receive
13 reports on mortgage insurance and investment risk evaluation, including underwriting
14 guidelines, portfolio exposure, claims and write-down history."  In addition, according to the
15 Committee's charter, the Governance and Nominating Committee must also "periodically advise
16 and update the Board, during executive sessions held by the Board, with respect to its credit risk
17 oversight and control responsibilities."  The failure to develop internal controls and policies
18 designed to limit PMI's exposure to high-risk mortgages constituted a failure by the members of
19 PMI's Governance and Nominating Committee to promote the best interest of the corporation.

20 **Investment and Finance Committee**

21      47.    Members of the Board of Directors' Investment and Finance Committee
22 participated in and were responsible for the oversight of PMI's investment portfolio, investment
23 policies, insurance program and other financial matters. As stated in PMI's form 10-K for the
24 period ending December 31, 2007, the Investment and Finance Committee was responsible for
25 oversight of PMI's investment portfolio and its members were duty bound to "approve
26 investment strategies, monitor our investment performance, and oversee other capital matters"
27 and to maintain "a predictable, high level of investment income, while maintaining adequate
28 liquidity, safety and preservation of capital." PMI's "unconsolidated subsidiaries," including

9

1  FGIC are included within the purview of the Investment and Finance Committee.  By failing to

2  identify and address FGIC's departure from its traditional business model and increased reliance

3  on volatile CDOs, the members of the Investment and Finance Committee violated their duties

4  of care and good faith.

5  **Financial Guaranty Oversight Committee**

6       48.    Similarly, the members of the Board of Directors' Financial Guaranty Oversight

7  Committee participated in and were responsible for the oversight of PMI's investment in FGIC,

8  an investment that was devalued as a result of FGIC's insurance of CDOs.

9       49.    The Individual Defendants, including in particular the Officer Defendants, the

10  members of the Audit Committee, the members of the Governance and Nominating Committee,

11  the members of the Financial Guaranty Oversight Committee and the members of the

12  Investment and Finance Committee were responsible for maintaining and establishing adequate

13  internal accounting controls for the Company and to ensure that the Company's financial

14  statements were based on accurate financial information.  According to GAAP, to accomplish

15  the objectives of accurately recording, processing, summarizing, and reporting financial data, a

16  corporation must establish an internal accounting control structure.  Among other things, the

17  Individual Defendants were required to:

18          (a)    make and keep books, records and accounts, which, in reasonable detail,

19               accurately and fairly reflect the transactions and dispositions of the assets

20               of the issuer; and

21          (b)    devise and maintain a system of internal accounting controls sufficient to

22               provide a reasonable assurance that its guidelines with respect to its

23               portfolio of insured mortgages and related investments were adequate to

24               protect the company from the massive losses that it has sustained.

25  **V.    FACTUAL ALLEGATIONS**

26       50.    PMI provides mortgage and bond insurance and financial guaranty in the United

27  States, Europe, Asia and Australia.  PMI was formed as a division of Allstate Insurance in 1972

28  and went public in 1995.  In the early 2000s, PMI began to expand its book of insurance of non-

1  traditional mortgages including risky high loan to value mortgages, mortgages issued to so-

2  called "sub-prime" borrowers, adjustable rate mortgages and interest-only mortgages. All of

3  these products carried a greatly increased risk of default over traditional lower loan to value

4  fixed interest mortgages.

5      51.    In 2003, even as PMI was expanding its focus on insuring more risky mortgages,

6  the company purchased a 42% interest in FGIC, a bond insurer which, up to that point, had

7  focused its business almost exclusively on the insurance of municipal bonds, bonds which

8  carried very little risk of default. Soon after PMI's investment in FGIC, FGIC's business model

9  dramatically changed direction and the company began insuring an increasing number of CDOs,

10  securities that consist of bundled mortgages. Partially fueled by the change in strategy at FGIC,

11  between 2004 and 2006, PMI's net income from its financial guaranty business increased by

12  more than 62%.

13      52.    PMI's increased focus on non-traditional mortgages, both through its provision of

14  mortgage insurance and through its investment in FGIC, continued and increased for several

15  years. By 2006, just three years after PMI had purchased its interest in FGIC, approximately

16  30% of FGIC's business revolved around the insurance of CDOs.

17      53.    By late 2006, the real estate market became increasingly volatile and investors

18  looked to the officers and directors of PMI for assurance that PMI was adequately insulated

19  from an unstable market. In response, through public statements and SEC filings, PMI's

20  officers repeatedly assured the public and investors that PMI management was actively

21  monitoring and carefully managing its portfolio. However, this was not the case.

22      54.    As early as September 2006, PMI's officers assured investors that their interests

23  were being protected. At a September 6, 2006 conference hosted by Keefe, Bruyette & Woods,

24  Inc., Defendant Smith stated that "we have a diverse stream of revenues and we think that the

25  overall trends are good for each of our overall business segments." At the same conference,

26  Defendant Smith downplayed the impact that a decline in the real estate market would have on

27  PMI by highlighting PMI's monitoring efforts. "[W]e feel very good about the distribution of

28  our overall portfolio risk at a national level but also at an individual MSA level. That's

11

1  something that we look at constantly at the company in terms of the operating results . . . think

2  of our risk index as a dashboard if you will . . . take a look at what are the implications for our

3  underwriting of our pricing in that particular market and how do we overall balance our

4  portfolio to the concentrations that we . . . want from a state and MSA level. That's a very

5  active portfolio management approach by PMI." Defendant Smith also assured the market that

6  the company was not overexposed to fluctuations in the market as a result of its investment in

7  FGIC, "Financial Guaranty has been a very strong success and we think there are good things

8  coming from that sector for PMI as well. Our investments in FGIC ... provided growth to PMI

9  Group but also balanced to our overall portfolio." Smith concluded his comments at the

10 conference by reiterating that PMI's management and directors were carefully monitoring PMI's

11 capital. "We obviously continue to adhere to a very balanced approach to risk and our capital

12 management obviously remains a priority as it has been for many, many years."

13    55.    The theme of PMI's disciplined and diversified business model was reiterated to

14 investors and the public at an October 2006 investor conference by Defendant Katkov, the

15 President and Chief Operating Officer of PMI's subsidiary, PMI Mortgage Insurance company:

16 "[w]e use disciplined risk management to reduce volatility . . . That's the value story for the PMI

17 Group in terms of domestic mortgage insurance, reduced volatility, capital optimization and

18 sustainable risk adjusted returns." Defendant Katkov praised PMI's increased focus on insuring

19 riskier mortgages, stating that "consumers seem very comfortable with mortgage debt . . . we

20 are a full participant in 100 LTVs [loans with a loan to value ratio of 1 to 1]. We're very

21 comfortable. We think we know exactly how to both underwrite and price that risk."

22    56.    From November 2006 onward, the Director Defendants failed in their fiduciary

23 duty to PMI by consistently ignoring management's unwillingness to tighten its standards for

24 provision of mortgage insurance, allowing PMI to continue to insure risky mortgages such as

25 100% loan to value mortgages.

26    57.    At the same time, directors ignored the fact that FGIC was also heavily

27 dependant on its business of insuring CDOs which, because they consisted of bundled

28 mortgages, faced the same risks as the mortgages insured by PMI.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No. :

1    58.    By the beginning of 2007, the United States credit market continued to worsen,

2   but even as PMI's officers began, through a series of partial disclosures, to disclose the extent of

3   PMI's exposure, they continued to provide rosy assessments of their own diligence and they

4   failed to take action, through the adoption of tighter internal controls and policies, to protect

5   corporate interests.

6    59.    In the course of PMI's April 30, 2007 conference call announcing earnings for

7   the first quarter of 2007, Defendant Smith acknowledged the "rapidly changing credit

8   environment" but claimed that "with this change, we have seen very high demand for our

9   insurance products . . . this will provide significant opportunities for us to grow our domestic

10   business." Even while acknowledging that the company was increasing its reserve for losses,

11   Defendant Smith reassured investors by claiming that "now, as we've always done, we're being

12   mindful of risk in the marketplace, choosing opportunities to participate in business that offers

13   attractive risk adjusted returns."

14    60.    Thereafter, during PMI's July 31, 2007 conference call, Defendant Smith, after

15   noting growing concerns over the state of the U.S. real estate market, stated "[h]owever, as we

16   have for more than 35 years, we will successfully manage through these conditions to continue

17   to optimize our long term performance." Later in the call, and again while addressing concerns

18   regarding the broader market, Smith stated "it is important to keep in mind the breadth of PMI's

19   diversified business operations." In truth, PMI's management had left the company overexposed

20   to substantial risk in the rapidly deteriorating market and PMI's directors had abdicated their

21   responsibility to the company and its investors by failing to force management to adopt and

22   adhere to adequate internal controls. Instead of "diversified business operations" PMI was

23   doubly invested in a volatile and failing market. As mortgage default rates increased, PMI

24   faced increasing losses related to its provision of mortgage insurance. That very same increase

25   in default rates directly impacted PMI's investment in FGIC as the CDOs that FGIC insured

26   became devalued. Indeed, even as Defendant Smith touted "long term trends that will bode well

27   for our business" including "a more realistic assessment of risk and a return to provincial

28   lending standards," PMI was continuing to insure risky 100% loan to value mortgages.

13

61.    Even as investor concern over the state of the credit market grew, Defendant Smith sought to reassure investors and the public that PMI's officers and directors were closely and carefully monitoring PMI's portfolio.  At a September 10, 2007 conference sponsored by Lehman Brothers, Defendant Smith again downplayed PMI's exposure to the worsening credit market.  Addressing the "overall credit outlook for PMI," Smith stated: "[f]irst, let me say fundamentally we are risk managers.  It's what we do day and day out, it's the fundamental franchise, it's understanding the risk, pricing it appropriately, understanding the operational risk and monitoring those and delivering a sound outcome."

62.    Because of its investment in FGIC, PMI was dangerously exposed to declines in the value of mortgage debt.  Said declines exposed Financial Guaranty, FGIC's bond insurance division, to substantial risk of default on the bonds that it insured.

63.    PMI's failure to write down its investment in FGIC in a timely manner resulted in a material overstatement of its financial results.

64.    PMI's failure to write down its investment in FGIC in a timely fashion also violated GAAP.

65.    PMI failed to adequately account for loss reserves, a further violation of GAAP, resulting in material misstatements in its financial results.

66.    Because it failed to adequately account for the instability and volatility in the subprime lending market and the mortgage market in general, PMI lacked a reasonable basis upon which to forecast earnings.  As a result, PMI's projections regarding earnings were materially misstated.

67.    PMI, with the participation, knowledge and/or approval of the Individual Defendants, disseminated its false financial statements in the following Form 10-K and Form 10-Q filings:

**Form 10-Qs:**

Form 10-Q filed on November 7, 2006 for the period ending September 30, 2006;

Form 10-Q filed on May 7, 2007 for the period ending March 31, 2007;

Form 10-Q filed on August 6, 2007 for the period ending June 30, 2007;

1    Form 10-Q filed on November 7, 2007 for the period ending September 30, 2007; and

2    **Form 10-K:**

3    Form 10-K filed on March 1, 2007 for the period ending December 31, 2006.

4    68.    Beginning in late July 2007, PMI began a series of incomplete disclosures

5  regarding the extent of PMI's losses arising from the downturn in the credit market. On July 31,

6  2007, following the issuance of a press release highlighting PMI's net income for the second

7  quarter, PMI updated its financial guidance for the year, increasing its estimated of total

8  incurred losses to between $450-$550 million, a dramatic increase from its prior estimate,

9  issued on April 30, 2007 of between $300 and $360 million.

10    69.    On August 29, 2007, PMI was again forced to address the deteriorating credit

11  market, this time addressing a downward revision in the ratings of PMI Guaranty Co. and PMI

12  Mortgage Insurance Co., two PMI subsidiaries, from AA+ to AA.  However, in announcing the

13  downgrade, Defendant Smith downplayed its significance, stating "[i]t is important to recognize

14  that the ratings changes made by Fitch were primarily driven by a change in their ratings

15  methodology and capital model . . ."

16    70.    On October 18, 2007, PMI issued a press release announcing that, as a result of

17  "the continued weak housing and mortgage markets and associated dislocation in the credit

18  derivative markets," the company expected to report a net loss of $1.05 per share for the third

19  quarter of 2007.  The company acknowledged that worsening credit conditions were also

20  impacting FGIC and that, as a result, nearly one third of PMI's estimated loss for the quarter

21  would be related to its investment in FGIC.  PMI further announced that it was withdrawing its

22  financial guidance for the fiscal year.

23    71.    Shortly thereafter, on October 19, 2007, Standard & Poor's announced that PMI

24  had been placed on a negative CreditWatch with negative implications.

25    72.    As a result of these disclosures, the value of PMI stock began a rapid decline,

26  dropping from a close of $29.51 per share on October 16, 2007 to $17.96 per share on October

27  23, 2007, a five day decline of nearly 40%.

28

73.     The rapid decline that began with the mid-October disclosures continued, nearly unabated, over the following months as, bit by bit, a true portrait of PMI's precarious position and outlook was painted.

74.     Following the October 2007 disclosures, PMI's outlook continued to worsen as rating agencies began paying even closer attention to the status of FGIC.  On November 5, 2007, Fitch Ratings announced that it was reviewing the capital position of FGIC's bond insurance arm, Financial Guaranty with an expectation that Financial Guaranty faced a "high probability" risk of losing its AAA rating because of a failure to meet its capital requirements. Fitch's announcement was followed one month later by announcements by Standard & Poor's and Moody's that both were considering downgrading Financial Guaranty.  The downgrades followed on January 30 and 31, 2008 as Fitch Ratings downgraded Financial Guaranty to AA and, the very next day, Standard & Poor's downgraded Financial Guaranty to AA and FGIC from AAA to A.  On January 31, 2007, Moody's also announced that it was reviewing PMI for a possible downgrade.

75.     Then, on February 11, 2008, PMI announced that it was tightening lending guidelines and would no longer insure loans with a loan to value ratio in excess of 97% in a belated effort to limit its exposure to high risk loans.

76.     After the close of the market on March 3, 2008, PMI was forced to disclose that it would not be able to file its annual 10-K report in a timely fashion.  PMI also disclosed that, as a result of massive losses at FGIC, PMI would not invest any additional capital in the company.  In the day following the issuance of the press release, PMI stock fell 5%, to $6.43.

77.     Thereafter, on March 17, 2008, PMI issued its results for fiscal year 2007, disclosing a loss of more than $1 billion for the fourth quarter of fiscal year 2007, the majority of which resulted from losses at FGIC:

> The PMI Group, Inc. (NYSE: PMI) (the "Company") today reported a net loss for the full year 2007 of $915.3 million, or $10.81 per basic and diluted share. Net income for the full year 2006 was $419.7 million, or $4.57 per diluted share. The net loss for the fourth quarter 2007 was $1.0 billion or $12.51 per basic and diluted share, compared to net income in the fourth quarter 2006 of $100.5 million, or $1.19 per diluted share. The net loss for the fourth quarter of 2007 was primarily due to our equity in the losses from FGIC of $776.1 million (after tax) and a net loss of $236.0 million in the U.S. Mortgage

16

Insurance Operations due to increases in paid claims, loss adjustment expenses and additions to the reserve for losses (collectively "Losses and LAE").

**Key results include:**

1) U.S. Mortgage Insurance Operations — The net loss was $236.0 million in the fourth quarter of 2007. During the fourth quarter, the Company added $434.8 million to the reserves for losses and loss adjustment expenses and paid $114.5 million in claims. Total revenues in the fourth quarter increased by approximately 9% compared to the fourth quarter of 2006, driven by strong growth in net premiums written and earned. Insurance in force at the end of 2007 was $123.6 billion, representing a 20% increase from one year ago.

2) International Operations — PMI Australia posted net income of $17.8 million in the fourth quarter of 2007 on higher premiums earned and net investment income, partially offset by higher Losses and LAE. Losses and LAE increased in the fourth quarter of 2007 to $29.4 million from $17.8 million in the fourth quarter 2006 due primarily to higher claim rates. PMI Europe reported a net loss of $29.6 million in the fourth quarter 2007, primarily as a result of increased Losses and LAE of $22.1 million and an unrealized $8.4 million (pre-tax) mark-to-market loss on credit default swaps related to European prime mortgage risks due to widening credit spreads. PMI Asia reported net income of $2.9 million fueled by strong growth in reinsurance premiums written compared to the fourth quarter 2006.

3) Financial Guaranty — equity in losses from FGIC for the fourth quarter of 2007 were $776.1 million (after tax), as a result of higher Losses and LAE and an unrealized mark-to-market loss related to its credit derivative portfolio. During the fourth quarter, the Company recorded an other than temporary impairment of its investment in Ram Re of $38.5 million (pre-tax).

Following the announcement, PMI stock dropped from a closing price of 5.69 on Friday, March 14 to $5.12 on March 17 on heavy volume of 2.5 million shares.

## VI.    DERIVATIVE ACTION ALLEGATIONS

78.    Plaintiff brings this action on behalf, and for the benefit, of PMI, to redress harm and damages suffered and continuing to be suffered by PMI as a direct and proximate result of defendants' breaches of fiduciary duty and violations of law as alleged herein. PMI suffered and continues to suffer damages as a result of loss of capital, loss of profits as well as attorneys fees and costs related to consequent securities class actions filed against PMI and any potential damages arising therefrom. PMI is named as a nominal defendant in a derivative capacity.

79.    Plaintiff is a retirement and disability fund representing members of Local 85 of the Amalgamated Transit Union who are or were employed by the Port Authority of Allegheny

17

1   County and will fairly, diligently and adequately represent the interests of PMI and its

2   shareholders in this litigation.

3       80.     Plaintiff, currently and during the relevant time, has owned PMI securities and

4   intends to retain shares in PMI throughout the course of this litigation.

5       81.     The wrongful acts alleged and complained of herein subject, and will continue to

6   subject, PMI to continuing harm resulting from the Individual Defendants' breach of fiduciary

7   duty and violations of law.

8       82.     This is not a collusive action to confer jurisdiction that the court would otherwise

9   lack on a court of the United States.

10  **VII.   DEMAND IS FUTILE**

11      83.     Plaintiff has made no demand on the Board of Directors of PMI to institute any

12  action in connection with the facts giving rise to the allegations of this Complaint. Any such

13  demand would be futile and useless because the Director Defendants are incapable of making an

14  independent or disinterested decision to institute and diligently prosecute this action.

15      84.     The Board of Directors of PMI currently consists of 13 directors, identified

16  herein as the Director Defendants. For the reasons set forth below, the Director Defendants are

17  incapable of independently and disinterestedly considering a demand to commence and

18  vigorously prosecute this action:

19      • Defendant Smith because Defendant Smith is and was, at all times relevant,

20          CEO of PMI, a member and/or Chair of PMI's Board of Directors and a

21          member of the Financial Guaranty Oversight Committee.  As a result of

22          Defendant Smith's position, he was aware of the substantial risk posed to

23          PMI and its investors by his business decisions. Defendant Smith also issued

24          or caused to be issued numerous false or misleading class period statements,

25          thus subjecting himself to liability under federal securities laws.

26      • Defendant Widener, because Defendant Widener also serves as a Director of

27          First American Bank Corporation, a publicly traded corporation that, like

28          PMI, operates in the surety and title insurance industry.  Additionally

18

1    because, in May and June 2006, Widener exercised and sold 2,625 shares of

2    PMI, realizing proceeds of approximately $66,000.

3    • Defendant Zech, because on May 18, 2007, Zech exercised and sold 9,000

4    shares of PMI, realizing proceeds of approximately $222,000 with

5    knowledge of non-public, inside information regarding PMI's exposure to

6    high risk loans and failure to implement adequate policies, procedures and

7    internal controls to address and prevent that overexposure.

8    • Defendants Guerro, Byerwalter, Castle, Roach and Widener, because as

9    members of the Audit Committee, each directly participated in and approved

10    PMI's violations of GAAP, as alleged herein, and are substantially likely to

11    be held liable for breaching their fiduciary duties.  As stated in the charter of

12    the Audit Committee, the Committee was charged with monitoring "the

13    integrity of the financial statements of the company [and] the compliance by

14    the company with management's policies and procedures regarding legal and

15    regulatory requirements[]."   In addition, the members of the Audit

16    Committee were responsible for reviewing "the adequacy of internal controls

17    that could significantly affect the Company's financial statements."

18    • Defendants Hedien, Guerro, Lower, Scheid and Zech, because, as members

19    of the Governance and Nominating Committee, each participated in and

20    approved of PMI's corporate governance practices.  As stated in the charter of

21    the Governance and Nominating Committee, the committee is charged with

22    assisting the board "in promoting the best interests of the corporation and its

23    shareholders though the implementation of sound corporate governance

24    principles and practices."   The Governance and Nominating Committee is

25    responsible for "credit risk oversight and control and shall receive reports on

26    mortgage insurance and investment risk evaluation, including underwriting

27    guidelines, portfolio exposure, claims and write-down history."  In addition,

28    the Governance and Nominating Committee must also "periodically advise

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.:

1  and update the Board, during executive sessions held by the Board, with

2  respect to its credit risk oversight and control responsibilities." The failure to

3  develop internal controls and policies designed to limit PMI's exposure to

4  high-risk mortgages constituted a failure by the members of PMI's

5  Governance and Nominating Committee to promote the best interest of the

6  corporation.

7  • Defendants Rosen, Scheid, Lower, Hedien, Widener and Villarreal because,

8  as members of the Investment and Finance Committee, each participated in

9  and was responsible for the oversight of PMI's investment portfolio,

10  investment policies, insurance program and other financial matters. The

11  Investment and Finance Committee was responsible for oversight of PMI's

12  investment portfolio, the duties of its members included the duties to

13  "approve investment strategies, monitor our investment performance, and

14  oversee other capital matters." In addition, the Investment and Finance

15  Committee is duty bound to provide and maintain "a predictable, high level

16  of investment income, while maintaining adequate liquidity, safety and

17  preservation of capital." PMI's "unconsolidated subsidiaries," including

18  FGIC, are included within the purview of the Investment and Finance

19  Committee.

20  • Defendants Zech and Smith because, as members of the Financial Guaranty

21  Oversight Committee, each participated in and was responsible for the

22  oversight of PMI's investment in FGIC, an investment that was devalued as a

23  result of FGIC's insurance of CDOs.

24  • All of the Director Defendants because, as alleged herein, as directors of

25  PMI, they directly participated in the preparation, and approved the filing, of

26  false financial statements and other SEC filings and are substantially likely to

27  be held liable for breaching their fiduciary duties, their duty of care and their

28  duty of good faith. Moreover, by colluding with the Officer Defendants, as

alleged herein, the Director Defendants have demonstrated that they are unable and/or unwilling to act independently of the Officer Defendants.

- The Director Defendants typically met at least six times per year. The failure of the Director Defendants to act to address the wrongs complained of herein at these meetings constitutes a prolonged and systemic failure and breach of the Director Defendants' duties of care and good faith.

- The following chart summarizes the positions of the Director Defendants:

| Director Defendant | Member of Financial Guaranty Oversight Committee during relevant time period | Member of Audit Comm During relevant time period | Member of Governance and Nominating Comm. During relevant time period | Member of Investment and Finance Comm. During relevant time period | Sold Stock In Relevant Time Period | Signed 10-K with false financial statements | Signed 10-Qs with false financial statements |
|---|---|---|---|---|---|---|---|
| Mariann Byerwalter | | X | | | | X | |
| Dr. James C. Castle | | X | | | | X | |
| Carmine Guerro | | X | X | | | X | |
| Wayne E. Hedien | | | X | X | | X | |
| Louis G. Lower, II | | | X | X | X | X | |
| Raymond L. Ocampo, Jr. | | | | X | X | X | |
| John D. Roach | | X | | | | X | |
| Dr. Kenneth T. Rosen | | | | X | X | X | |
| Steven L. Scheid | | | X | | X | X | |
| L. Stephen Smith | X | | | | X | X | X |
| Jose H. Villarreal | | | | X | | X | |
| Mary Lee Widener | | X | | X | | X | |
| Ronald H. Zech | X | | X | | X | X | |
| W. Roger Haughton (stepped down in May 2007) | | | | | | X | |

85.    Based on the facts set forth herein, a pre-filing demand upon PMI's Board of Directors to institute this action would have been a useless and futile act because:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No :

- The members of PMI's Board of Directors have demonstrated their unwillingness to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law and their fiduciary duties complained of herein.

- The members of PMI's Board of Directors breached their fiduciary duties to PMI by failing to demand the imposition of reasonable internal controls and policies designed to prevent overexposure to losses resulting from increased volatility in the mortgage and credit markets.

- The acts complained of herein constitute violations of the fiduciary duties owed to PMI by its officers and directors and these acts are incapable of rectification.

- Any suit by the current directors of PMI to remedy the wrongs complained of herein would likely further expose the liability of the Individual Defendants, which would result in additional civil or criminal actions against the Individual Defendants.

86.    In addition, demand is excused where, as here, the misconduct complained of was not, and could not have been, an exercise of good faith business judgment.

## FIRST CAUSE OF ACTION

### Against the Individual Defendants
### For Breach of Fiduciary Duty

87.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

88.    As alleged herein, the Individual Defendants breached their fiduciary duties of good faith and due care by failing to devise and maintain a system of internal accounting and investment controls sufficient to provide a reasonable assurance that its guidelines with respect to its portfolio of insured mortgages and related investments were adequate to protect the company and its assets.

1    89.    As alleged herein, the Individual Defendants further breached their fiduciary

2    duties violating GAAP.

3    90.    As alleged herein, the Director Defendants breached their fiduciary duties of

4    good faith and due care, consciously and purposely abdicating their responsibilities as Directors

5    by allowing, producing, approving or disseminating to PMI shareholders and the public false

6    financial statements that failed to disclose the magnitude of the risk faced by PMI arising from

7    the Individual Defendants' failure to devise and maintain a system of internal accounting

8    controls sufficient to provide a reasonable assurance that its guidelines with respect to its

9    portfolio of insured loans and related investments were adequate to protect the company and its

10    assets.

11    91.    The Director Defendants further breached their fiduciary duties to the Company

12    because their actions exposed the Company to lawsuits by investors alleging violations of

13    federal securities laws.

14    92.    As a result of the Individual Defendants' breach of their fiduciary duties, PMI

15    sustained in excess of $1 billion in damages.

16    93.    As a result of the conduct alleged herein, the Individual Defendants are liable to

17    PMI.

18    ### SECOND CAUSE OF ACTION

19    **Against the Individual Defendants**
**For Waste of Corporate Assets**

20

21    94.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if

22    set forth fully herein.

23    95.    By failing to properly consider the interests of PMI and its shareholders, by

24    failing to conduct proper supervision and by failing to devise and maintain a system of internal

25    accounting controls sufficient to provide a reasonable assurance that its guidelines with respect

26    to its portfolio of insured loans and related investments were adequate to protect the company

27    from the massive losses that it has sustained, the Individual Defendants have caused PMI to

28    waste valuable corporate assets.

## THIRD CAUSE OF ACTION

### Against the Individual Defendants
### For Abuse of Control

96.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

97.    The misconduct alleged herein constituted an abuse of the Individual Defendants' ability to control and influence PMI, abuse for which they are liable.

98.    As a direct and proximate result of the Individual Defendants' abuse of control, PMI has sustained, and continues to sustain, damages.

99.    As a result of the conduct alleged herein, the Individual Defendants are liable to PMI.

## FOURTH CAUSE OF ACTION

### Against the Individual Defendants
### For Gross Mismanagement

100.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

101.    By their actions as alleged herein, the Individual Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of PMI, a publicly traded corporation.

102.    In the course of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet they failed to adopt an internal system of accounting controls necessary and sufficient to provide a reasonable assurance that its guidelines with respect to its portfolio of insured loans and related investments were adequate to protect the company and its assets.

103.    By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence and candor in the management and administration of PMI's affairs and in the use and preservation of PMI's assets.

104.    As a direct and proximate result of the Individual Defendants' abuse of control, PMI has sustained, and continues to sustain, damages.

24

1    105.    As a result of the conduct alleged herein, the Individual Defendants are liable to

2   PMI.

3                                **PRAYER FOR RELIEF**

4        106.    Wherefore, Plaintiff, on behalf of PMI, demands judgment as follows:

5        107.    Against the Individual Defendants and in favor of PMI in the amount of the

6   damages sustained by the company as a result of the Individual Defendants breaches of

7   fiduciary duty, waste of corporate assets, abuse of control and gross mismanagement;

8        108.    Granting appropriate equitable relief to remedy the Individual Defendants'

9   breaches of fiduciary duties;

10        109.    Awarding to Plaintiff the costs and disbursements of this action, including

11   reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

12        110.    Granting further relief as the Court deems just and proper.

13        JURY TRIAL DEMANDED.

14   DATED: April 18, 2008                    Respectfully submitted,

15                                            BARRACK, RODOS & BACINE
                                             STEPHEN R. BASSER
16                                           SAMUEL M. WARD
                                             JOHN L. HAEUSSLER
17

18

19                                           _____
                                                    STEPHEN R. BASSER
20                                           402 West Broadway, Suite 850
                                             San Diego, CA 92101
21
                                             BARRACK, RODOS & BACINE
22                                           LEONARD BARRACK
                                             DANIEL BACINE
23                                           3300 Two Commerce Square
                                             2001 Market Street
24                                           Philadelphia, PA 19103

25                                           Attorneys for Plaintiff, the Port Authority of
                                             Allegheny County Retirement and Disability
26                                           Allowance Plan for Employees represented
                                             by Local 85 of the Amalgamated Transit
27                                           Union

28

                                        VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
                                                                        Case No :

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY DEMAND

Plaintiff demands a jury trial on all issues.



Date:  April 18, 2008

_____

STEPHEN R. BASSER

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Case No.:

## VERIFICATION

I, Sabatino DiNardo Jr , hereby verify that I am Chairman of The Port Authority of Allegheny County Retirement and Disability Allowance Plan for Employees represented by Local 85 of the Amalgated Transit Union ("ATU85") and am authorized to make this verification on its behalf. I have reviewed the Complaint and authorize its filing on behalf of ATU85, and that the facts set forth in the Complaint are true and correct to the best of my knowledge, information and belief.

I verify under penalty of perjury that the foregoing is true and correct.

DATE:  April 17, 2008

Sabatino DiNardo Jr.